UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| REBECCA SILLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 1:04-CV-149 |
| | ) |
| BENDIX COMMERCIAL VEHICLE | ) |
| SYSTEMS LLC., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

After Defendant, Bendix Commercial Vehicle Systems LLC ("Bendix"), terminated Plaintiff, Rebecca Sills ("Sills"), for excessive absenteeism, she brought the instant suit alleging that her termination violated the Family and Medical Leave Act ("FMLA"), both as to her substantive rights under the FMLA and in retaliation for having taken FMLA leave.

Before the court are Bendix's, Motion for Summary Judgment filed on March 18, 2005 along with a Motion to Strike filed by Sills relating to portions of an affidavit Bendix submitted as part of the summary judgment record. Sills responded to Bendix's summary judgment motion on July 18, 2005 and included in her response a request for partial summary judgment.  On August 5, 2005, Bendix replied and, in addition, filed its "Motion to Strike the Affidavit of Donald Andrew Sills and Plaintiff's Request for Partial Summary Judgment"[1] filed on August 5, 2005. Sills responded to Bendix's Motion to Strike on August 9, 2005 to which Bendix replied on August 19, 2005.

---

[1] The Motion to Strike Plaintiff's Request for Partial Summary Judgment is DENIED.  Plaintiff filed the motion along with her response brief and, it appears, the motion was spawned by the Defendant's legal position in its motion for summary judgment that Sills was not eligible for leave.

For the following reasons, Bendix's Motion for Summary Judgment will be GRANTED. Sills' Request for Partial Summary Judgment will be DENIED.   Both Motions to Strike will be DENIED.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).   When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted.  *Payne*, 337 F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.*  However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## Factual Background

### a.  Overview of Bendix and Relevant Policies

Bendix supplies air brakes, electronic braking systems and similar safety technologies for medium-duty and heavy-duty trucks, tractors, trailers, buses and other commercial vehicles.  Bendix employs approximately 400 salaried and hourly employees at the Huntington, Indiana facility where

Sills was employed.

Bendix maintains and publishes to employees various policies and procedures that govern the employment relationship, including a policy relating to leaves under the FMLA ("Leave Policy"). That policy provides that employees must be employed for 12 months and work 1,250 hours or more during the 12-month period preceding the leave to be eligible for FMLA leave. If eligible, the policy provides employees with up to 12 weeks of unpaid leave in any rolling calendar year. Employees requesting leave pursuant to the policy are required to substantiate their medical condition with a certification from a health care provider. The certification form must be returned to Bendix within 15 days after the form is provided. Failure to return the form results in denial of FMLA leave for absences occurring prior to the Company's receipt of the completed form. The requirement that a certification form be provided to Bendix is consistent with the provisions of the FMLA.

Bendix's employee handbook sets out the above requirements for obtaining FMLA leave, including the requirement that a certification form must be supplied to Bendix within fifteen (15) days after the form is provided. Sills received and signed the handbook as well as other forms outlining the requirements for leave. (Sills Dep. p. 50; Dfdt's Exh. E).

Bendix also maintains a medical leave of absence policy (hereinafter "Medical Leave Policy") which provides:

> **You may be granted a medical leave of absence if you are unable to perform your assigned duties due to sickness, injury or disability.** You are entitled to up to 26 weeks of disability pay through Workers' Sick and Accident. Any time exceeding the 26 weeks would be unpaid.
>
> The appropriate paperwork must be completed by you and your physician in order to be approved for the leave. Any medical leave time taken through Workers' Sick and Accident will automatically coincide with Family and Medical Leave time

3

for which you may be eligible.  A fully completed Return to Work statement is required from your physician before you can return to work.

Medical leaves may be initially granted for up to 60 calendar days and may be extended in increments of up to 60 days each, to a maximum of 12 months.  Your service will continue for up to 12 months during your medical leave.

Dfdt's Exhibit G.

In addition to the above policies, Bendix maintains a Company Attendance Policy ("Attendance Policy") for its employees.  Pursuant to this Attendance Policy, employees accrue hours of absence and "occurrences" on a no-fault basis for time off work.  Missed hours and occurrences are tracked on a quarterly basis starting anew at the beginning of each quarter. Employees receive progressive, disciplinary "steps" for exceeding a certain number of hours or reaching a specified number of occurrences in any quarter.  Employees are subject to termination when they reach Step 4 under the Attendance Policy.  Employees advance a step for reaching the following in any given quarter:

| | |
|---|---|
| Step 1: | exceeding 20 hours and/or reaching 6 occurrences |
| Step 2: | exceeding 30 hours and/or reaching 8 occurrences |
| Step 3: | exceeding 40 hours and/or reaching 10 occurrences |
| Step 4: | exceeding 50 hours and/or reaching 12 occurrences |

Although hours and occurrences are deleted at the end of each calendar quarter, an employee's step progression remains intact.  Thus, if an employee has progressed to Step 2 in a previous quarter, the employee starts the new quarter with 0 hours and 0 occurrences but remains at Step 2.  The employee would move to Step 3 if he or she accumulated more than 20 hours and/or 6 occurrences in the next quarter.

The Attendance Policy further clarifies how approved leave under the Medical Leave policy will be treated according to the Attendance Policy:

4

> A medical leave of absence may be granted when an employee is not eligible for FMLA or the WS& A approved absence is less than 8 consecutive calendar days. The leave must be approved by the Human Resources Manage and your BTL. The approved leave will count as 20 hours and one occurrence for all shifts for two or more days of absence. Documentation to support the medical leave must be furnished by a healthcare provider. An employer will not be required to use vacation before a medical leave is granted.

Exhibit D. Under this policy, any leave taken results in the accumulation of 20 hours of missed work and one occurrence.

**b.** **Sills's Employment at Bendix and her Medical Condition**

Sills began her employment with Bendix on January 11, 1999 and remained employed continuously until her termination on February 26, 2004. Sills was assigned to work four ten-hour shifts per week.

It is undisputed in the record that Sills suffers from debilitating migraine headaches[2] which totally incapacitate her and make her unable to work. (Sills Dep. pp. 13-15; Pltf's Admissions in Dfdt's Exh. UU ¶20-22, 25-26 indicating that Sills missed work because "she was totally incapacitated from any work due to sudden onset of her chronic migraine headaches."). As a result, once she reached the FMLA eligibility standards,[3] she sought intermittent FMLA leave from Bendix for these headaches. Prior to requesting FMLA leave, Sills had reached Step 3 of the Attendance Policy for absences relating to her migraine headaches. In August 1999, Bendix

---

[2]Sills is under the care of a neurologist for her migraine headaches and is prescribed various medications in an attempt to control her condition..

[3]As will be discussed in greater detail infra, the FMLA defines the term "eligible employee" as an employee who has been employed: (i) for at least 12 months by the employer with respect to whom leave is requested ...; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period. 29 U.S.C. § 2611(2)(A). Although the application of the eligibility standards is largely disputed in this case, it is undisputed that Sills did not initially qualify for FMLA leave time until she worked for Bendix for 12 months and accrued 1,250 hours.

counseled Sills that if her attendance did not improve she would progress to Step 4 and "be placed on immediate suspension pending review of [her] file."  In an attempt to not accrue additional absences, Sills testified that she often over-medicated herself to be able to report to work. However, once Sills became eligible for FMLA leave, she did not reach Step 3 of the Attendance Policy until near the time of her termination.

Sills requested intermittent FMLA leave for her migraine headaches beginning in December 2000 until December 2001. At that time she submitted the required certification forms pursuant to Bendix's FMLA Leave Policy.  Thereafter, in January 2002, Sills submitted, as required by Bendix's Leave Policy, timely annual health care provider certifications to continue her intermittent leave from January 15, 2002 until January 14, 2003.  Bendix again certified Sills's FMLA leave in January 2003 through January 20, 2004.  As is evident by the above dates, each year at or around the time her previous certification expired, Sills requested and Bendix supplied the certification forms.  Each year when Sills returned the medical certification form, Bendix considered it a request for a renewed term of 12 weeks of FMLA leave for the following 12 months.[4] During these time frames, Sills utilized the full twelve weeks of leave, to which she was

---

[4]There are significant disputes in the briefs concerning whether Sills received notice that her FMLA leave was approved during this time and whether that notice, if received, was verbal or written. Sills's brief, for instance, states "Bendix never told Sills that her intermittent FMLA leave request was approved or that it was approved only for a limited period of time or that it expired on any certain date." (Pltf's Brief at 4).  The documentary evidence and Sills's own testimony, however, contradicts the assertions in her brief that she was not notified of the status of her FMLA leave or that she was not made aware of the recertification process.  *See* Sills Dep. at 241-42 (wherein Sills indicates that she initiated the recertification process); Sills Dep. at 98-99 (wherein Sills agrees that she was verbally told of her eligibility status on some occasions and that on another she confirmed that human resources had received the recertification paperwork and that her FMLA status was "okay.").  Defendants also submitted Exhibits N, Q, T, and X which are memos to Sills specifically stating that she was eligible for FMLA leave for the period in question and listing the dates for which the FMLA leave was granted. In her deposition, Sills denied receiving at least one of the memos and Miller testified that she did not provide these to Sills but instead gave them to Sills' supervisor to pass onto Sills. (Miller Dep. at 14)  The

entitled, but on an intermittent basis.  It is undisputed that Sills utilized this leave without penalty by Bendix for the days she missed due to her migraine headaches.[5]

In January 2004, Sills continued to take time off from work for headaches.  On January 19, 2004, Sills requested certification paperwork for her physician so that she could renew her FMLA term for the next twelve months.  Bendix advised Sills that she had 15 days, until February 3, 2004, to return her certification form and that her failure to do so would result in the denial of leave taken prior to the return of the form.  Sills signed and dated the written notification from Bendix confirming her understanding of this requirement.

On January 20, 2004, Tricia Miller ("Miller"), Bendix's Human Resources Generalist, and Sills's supervisor, Brian Simon ("Simon"), spoke with Sills regarding her attempt to use FMLA leave to cover absences on January 7 and 8, 2004.  At the time of these absences, Sills had utilized all twelve weeks of leave to which she was entitled for the previous rolling calendar year.  At that time, Bendix also provided Sills with a record of her FMLA leave usage for the previous 12 month period and indicated to Sills that she was required to track her leave usage.  Bendix did not, however, count the absences on January 7 and 8 against Sills's attendance despite her ineligibility to take the days as FMLA designated leave.

---

relevance of this factual dispute is not apparent to the court since Sills does not assert that Bendix interfered with her FMLA rights at any time prior to 2004.  Rather, the record is clear and undisputed that Sills took all of the FMLA leave to which she was entitled in each year prior to 2004.

[5]On two other occasions during this time, Sills also requested continuous periods of FMLA leave. On January 11, 2001, Sills requested six weeks of consecutive leave for surgery and, in July 2003, Sills requested another six week period of consecutive leave for surgery.  Sills did not have sufficient FMLA time remaining in the rolling calendar year to cover this latter absence.  However, Bendix permitted Sills to be absent on a non-FMLA medical leave pursuant to its Medical Leave Policy for the six week period from July 15 until September 8, 2003.  When Sills returned to work after the non-FMLA leave of absence she continued to take intermittent leave for her headaches as she had done prior to the leave of absence.

Between January 20 and February 3, 2004 and prior to her return of the certification paperwork for the new rolling calendar year, Sills continued to intermittently miss work due to migraine headaches. Sills missed a total of 30 hours of work due to headaches and took 25 hours of vacation during this period.

On February 3, Sills advised Human Resources that while she had mailed the recertification forms to her doctor, the doctor's office had not received them or completed them. By facsimile the same day, Bendix sent the recertification paperwork to Sills's doctor. Bendix received the completed paperwork on February 10, 2004. In the interim period between February 3 and February 10, 2004, Sills missed 21.5 hours due to headaches and took 5 hours of vacation time.

On February 18, 2004, Miller informed Sills that she was not eligible for FMLA leave because she had not worked 1,250 hours in the preceding twelve months. (Sills Dep. pp. 149-151). Bendix utilized four different methods to calculate the hours Sills worked in the preceding twelve month period; none of the methods resulted in Sills having worked more than 1,250 hours.[6] Sills does not dispute these calculations.[7]

Miller further advised Sills that her employment status would have to be evaluated since she had missed time before her FMLA request was approved or denied. (Miller Dep. at 16). Sills then asked Miller whether her absences could be counted under the Medical Leave Policy. Miller informed her that they could not count under that policy because the Medical Leave Policy did not

---

[6]The periods calculated were (1) from the date of her request; (2) from the date of her first day of absence; (3) from the date her certification forms were due; and (4) from the forms were actually returned and Sills's eligibility determined.

[7]She contends only that under the FMLA, Bendix should not have calculated her hours worked for each year she continued her intermittent leave.

apply to situations where intermittent leave was needed.  (Sills Dep. at 248-249).[8]  Rather, the policy applied to consecutive leaves spanning two or more days.

Prior to notifying Sills of its belief that she did not qualify for FMLA leave, Bendix contacted the Department of Labor to ascertain whether it had properly determined her eligibility and whether it should count her absences against her under the Attendance Policy.  According to Miller, she was advised that she had properly determined Sills' eligibility and that "if that ended [Sills's] employment with [Bendix], that was how it worked." (Miller Dep., pp. 12-17).[9]

On February 20, 2004, Bendix determined that Sills's ineligibility for FMLA leave would cause all of her absences from January 20, 2004 onward to be counted against her under the company's Attendance Policy.  Bendix also determined that Sills had accumulated sufficient hours by February 5, 2004 to place her at Step 4 of the Attendance Policy and subject her to termination.  On February 26, 2004, Sills missed work again for her headaches.  By that time, she had utilized all 80 hours of vacation time available to her during the calendar year.  As a result, Bendix, through Gwen Scott ("Scott"), the Human Resources Manager, called Sills and notified her that she was being terminated under the Attendance Policy for absenteeism.  It is undisputed that Sills did not receive the counseling required under Bendix's Attendance Policy for Steps 2 and 3 of the

---

[8]Miller disputes both that Sills asked for leave and that she responded by indicating that the Medical Leave Policy did not apply to intermittent leaves.  Yet, she also testified that had the question been asked, she would have told Sills that the Medical Leave Policy only applied to consecutive leaves of absence spanning two days or more.  (Miller Dep. at 17).

[9]The factual statement is subject to a motion to strike filed by Plaintiff on the basis that anything the Department of Labor told Miller constitutes inadmissible hearsay.  However, as Bendix points out, the fact is not offered for its truth, i.e., that, in fact, Sills's eligibility had been properly determined but only to demonstrate Bendix's good faith attempt to make that determination.  Because Plaintiff has called into question, Bendix's intent, this information is relevant to that determination and does not constitute hearsay.  The Plaintiff's Motion to Strike is DENIED.

policy prior to her termination for reaching Step 4 of the Attendance Policy.  (Scott Dep. at 61).

## Similarly Situated Others

Bendix has terminated thirty-five employees for excessive absenteeism from January 1, 1999 to the present.  Of these employees, twenty-two did not use any FMLA leave at any time during their employment.  Further, Bendix states that it has terminated every employee who has reached Step 4 of the current Attendance Policy.[10]

## Events Prior to Sills Termination

In January 2003, Sills complained to Scott that her then-supervisor Brian Brumleve ("Brumleve") was unfairly disciplining her because she had taken FMLA leave.  (Scott Dep. at 27-28).  Sills was complaining about a disciplinary write up she received from Brumleve for which she believed she was unfairly written-up when other employees engaging in the same or similar conduct were not.  These other employees had not taken FMLA leave.  She further told Scott that Brumleve had relayed to her that she had a "red flag" in her file because of her FMLA leave time. (*Id.*). When asked in her deposition about the complaint, Scott testified:

> Q.    Did you consider her to e complaining she felt he [Brumleve] was retaliating against her for using FMLA?
> A:     That was one of her concerns.
> Q:     What did you do in response to Ms. Sills's complaints?
> A:     I felt that a lot of her concerns were related to her relationship with her

---

[10]Sills has attempted to counter the above facts by submitting an affidavit from her husband Donald Sills ("Mr. Sills") in which he states that he had reached Step 4 of the Attendance Policy but was not terminated.  Bendix has moved to strike this portion of the affidavit along with other statements in his affidavit for various reasons, including lack of personal knowledge and hearsay.  With respect to the allegation that Mr. Sills reached Step 4 of the Attendance Policy, a supplemental affidavit from Miller refutes this allegation by averring that Sills's husband reached Step 4 of a prior attendance policy which was in place prior to March 1996, not the current Attendance Policy.  That policy had six attendance steps and not four as does the present Attendance Policy.  The court shall not strike this portion of the affidavit as it appears based on personal knowledge.  However, the statement is irrelevant to the present case which calls into question only the present Attendance Policy.  To this extent, the Motion to Strike is DENIED.

> supervisor, and at that time I knew that we were going to be making changes in the supervisory staff.
>
> Q:     Okay.
> A:     And that it was going to result in a restructuring, and that Brian Brumleve would no longer be her supervisor.
> Q:     ...So what did you do in response to Ms. Sills complaints?
> A:     So I waited it out.

(Scott Dep. at 28).

Sills eventually complained to higher management regarding the discipline she had received from Brumleve.  Scott was then instructed and did, change the written discipline Brumleve had given Sills to a verbal warning.  (*Id.* at 33-35).  At the time of her termination, Brumleve was not her supervisor nor was the verbal warning she had received considered in the decision to terminate her.

Based upon these facts, defendant moved for summary judgment on the FMLA claims and plaintiff cross-filed seeking partial summary judgment on the issue of Plaintiff's eligibility for FMLA leave.  The court turns now to a legal analysis of these motions.

## Discussion

The FMLA creates two interrelated, substantive employee rights: first, an eligible employee has a right to twelve weeks of unpaid leave during any twelve-month period for a serious health condition that renders the employee unable to perform his job responsibilities and functions, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave. 29 U.S.C. §§ 2612(a), 2614(a); *Ragsdale v. Wolverine World Wide, Inc.* 535 U.S. 81, 86 (2002). Because the FMLA provides for these substantive rights, it also provides that it is unlawful for employers to  "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1).  If an employer interferes with

11

the employee's right to the leave, the deprivation of the right is a violation of the FMLA, regardless of the employer's intent. *Smith v. Diffee Ford-Lincoln-Mercury,* 298 F.3d 955, 960 (10th Cir.2002), *citing King v. Preferred Tech. Group,* 166 F.3d 887, 891 (7th Cir.1999).

Congress further made it unlawful for an employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by the Act or for taking leave under the Act, 29 U.S.C. § 2615(a)(2). The regulations explain that this prohibition encompasses an employer's consideration of an employee's use of FMLA-covered leave in making adverse employment decisions:

> [E]mployers *cannot use the taking of FMLA leave as a negative factor in employment actions,* such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c) (emphasis added).[11]

In this case, Sills asserts both interference with her right to FMLA leave and discrimination based on Bendix's decision to terminate her for absenteeism. Each claim shall be addressed in turn below.

### Interference with Sills's FMLA Rights

A plaintiff asserting an FMLA "interference" claim must establish the following by a preponderance of the evidence:

---

[11]Congress authorized the Department of Labor to promulgate regulations implementing the FMLA. 29 U.S.C. § 2654. The department's reasonable interpretations of the statute are therefore entitled to deference under *Chevron USA Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Ninilchik Traditional Council v. United States,* 227 F.3d 1186, 1191 (9th Cir.2000) (agency's interpretation of statute pursuant to statutory delegation of authority is entitled to *Chevron* deference); *Duckworth v. Pratt & Whitney, Inc.,* 152 F.3d 1, 5 (1st Cir.1998) (Labor Department's FMLA regulations were promulgated pursuant to statutory delegation and are entitled to *Chevron* deference).

(1) she is an eligible employee, as defined in 29 U.S.C. § 2611(2);
(2) Defendant is a covered employer, as defined in 29 U.S.C. § 2611(4);
(3) she was entitled to take leave under the FMLA;
(4) she gave adequate notice of her intention to take leave; and
(5) Defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights.

*See Hoge,* 384 F.3d at 244. *See also Harcourt v. Cincinnati Bell Telephone Co.,*--F.Supp.2d--, 2005 WL 2000666, at *5 (S.D.Ohio Aug.18, 2005); *Sorrell v. Rinker Materials Corp.,* 395 F.3d 332, 335 (6th Cir.2005); *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir.2003); *Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 427 (S.D.N.Y.2004). As noted previously, the employer's intent is irrelevant; if Plaintiff can show that she was denied FMLA benefits to which she was entitled, the employer is strictly liable. *See Hoge,* 384 F.3d at 244.

In its motion, Bendix challenges the first and fifth factors, and asserts that it is entitled to summary judgment because, as a matter of law, Sills was not an eligible employee at the time she requested leave in 2004 for her headaches and for this reason, it did not deny her FMLA benefits to which she was entitled. In particular, Bendix claims that when Sills sought FMLA leave in January and February 2004, she had not worked 1,250 hours in the previous 12 months so as to qualify for FMLA leave. Sills responds by arguing that the FMLA does not require annual certification of an employee's eligibility for FMLA leave. More directly, Sills contends that once she met the initial eligibility requirements to take FMLA leave for her migraine headaches in 2000, it was unlawful for her employer to discontinue her FMLA leave if she did not meet the 1,250 hour requirement annually. Thus, Sills seeks partial summary judgment on this issue.

Under the FMLA, the term "eligible employee" is defined as an employee who has been employed:

(i) for at least 12 months by the employer with respect to whom leave is

13

requested under section 102 [29 U.S.C. § 2612]; **and**

(ii) for at least 1,250 hours of service with such employer during the previous 12-month period.

29 U.S.C. § 2611(2)(A) (emphasis added).

According to Sills's reading of these requirements, she was an eligible employee once she worked 12 months for Bendix and accumulated 1,250 hours of service. Once she qualified, Sills contends, there is no statutory requirement that she continue to qualify each year (either calendar or rolling)[12] by meeting the 1,250 hours of service requirement or that the FMLA leave commenced anew each time she submitted her annual certification. Thus, under her analysis, she was entitled to 12 weeks of unpaid leave annually (regardless of how many hours she actually worked thereafter) until there was a break in her employment service with Bendix. Bendix, however, reads the requirements much more restrictively, and, as shall be explained below, this is rightly so.

There is no dispute that Sills met the FMLA eligibility criteria in January 2000, the first date that she requested intermittent leave for her migraine headaches. In fact, the evidence demonstrates that Sills took all twelve weeks of leave to which she was entitled each year. Sills contends, however, that this was her only "request" for leave and that her leave only "commenced" once – in January 2000 – and that the annual certifications merely extended the term of her original leave. It flows from this argument then, that it was error for Bendix to consider her recertification that she continued to suffer from migraines thereby requiring more FMLA leave, the commencement of a new period of FMLA leave.

To support this theory, Sills points to the regulations, particularly, 29 C.F.R. 825.110(a)(2),

---

[12]It is undisputed that Bendix operated on a rolling calendar year basis.

and (d) to demonstrate that under these regulations an eligible employee is one that "[h]as been employed for at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave" and that the determination of whether an employee meets these requirements "must be made as of the date leave commences." The dispute here, according to Sills, is whether each subsequent certification of her intermittent leave constituted the "commencement" of a new twelve month period of leave for purposes of the eligibility requirements. Bendix treated the certifications as beginning the twelve month period anew, and thus, if it was correct in doing so, Sills was not entitled to FMLA leave in January 2004 as a matter of law. If Bendix was incorrect, Sills is entitled to summary judgment on her interference claim.

We find the answer to this question in *Barron v. Runyon,* 11 F.Supp.2d 676 (E.D.Va. 1998), cited by Bendix, albeit under differing factual circumstances. In that case, the plaintiff requested and the defendant approved, intermittent leave for the plaintiff to care for a family member. At the time of each absence related to his request for intermittent leave, however, the employer recalculated whether the plaintiff met the 1,250 hour requirement so as to permit the absence to count as FMLA-qualifying leave. At some point, the plaintiff fell below the 1,250 hour requirement and was terminated for excessive absenteeism. He sued claiming interference with his FMLA rights.

In reviewing the facts, the court noted the employer's argument that each *absence* constituted a new period of leave and thus, the eligibility requirements should be recalculated after each absence to determine whether the absence could count as FMLA qualifying leave. The district court rejected this approach and concluded that "a series of absences, separated by days during which the employee is at work, but all of which are taken for the same medical reason, subject to the same notice, and taken during the same twelve-month period, comprises one period of intermittent leave."

15

*Id.* at 681.  Thus, the court concluded that Barron was only required to be an eligible employee on the date of his first absence related to the intermittent leave request and that the request for intermittent leave comprised one period of leave for the twelve month period.

The *Barron* court also shed light on two concerns raised by the employer, only one of which is relevant here.  The employer contended that the court's holding would permit an employee, such as Sills has here, to claim an entitlement to FMLA leave beyond a twelve month period  so long as she qualified on the first absence of the intermittent leave.  The court soundly rejected this theory stating:

> First, defendant suggests that the result reached here would allow an employee to take twelve weeks of FMLA leave over a period of many years--"forever," defendant says--provided that the first time leave is taken the employee has worked the requisite 1,250 hours.[13] Contrary to defendant's suggestion, however, leave cannot be taken "forever" on the basis of one leave request. Instead, the statute grants an employee twelve weeks of leave *per twelve-month period,* not indefinitely. *See* 29 U.S.C. § 2612(a)(1) ("[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period ...."); *accord* 29 C.F.R. § 825.200(a). **Any eligibility determination made on the date leave commences, then, can apply only to the twelve weeks the employee plans to take within the current twelve-month period, and thus defendant's fears on this score are unfounded.**

*Barron*, 11 F.Supp.2d at 682 -683(emphasis added; footnote in case).

As noted by the emphasis above, the key to the analysis in *Barron* is  the conclusion that an eligibility determination can apply "only to the twelve weeks the employee plans to take within the current twelve month period."  The same is true in this case.  The FMLA speaks in terms of 12 month

---

[13]Specifically, defendant offers the hypothetical of an employee who suffers from asthma and provides his employer with a doctor's certification that he needs to take medical leave for this condition. Given this, defendant incorrectly suggests that this employee could take several days off every year for decades to care for this condition based solely on the original certification.

periods.  An employee is entitled to twelve workweeks of leave per twelve month period.  29 U.S.C.

§2612(a)(1).  Likewise, to be eligible for such leave, the statute requires an employee to have been

employed "for at least 1,250 hours of service during the 12-month period immediately preceding the

*commencement* of the leave." 29 C.F.R. § 825.110(a)(2).  Given this framework, it is a reasonable

statutory interpretation, as the *Barron* court concluded, to require that an employee meet the

eligibility requirements annually, even in a case of intermittent leave taken for an ongoing medical

condition.      This court's conclusion is bolstered by an Opinion Letter FMLA-112 authored by the

Department of Labor ("the Department") , 2000 WL 33157366.[14]  In that letter, the Department,

citing to *Barron*, adopted its position and provided specific illustrations of how the holding affects

an employer's eligibility calculations:

> Assume an employee is diagnosed with an FMLA-qualifying chronic condition, such
> as MS as in your example, that results in an employee needing intermittent leave due
> to the episodic nature of the condition. For example, if an employee with MS who was
> eligible to take intermittent FMLA leave in April and May needed leave again when
> the episodes of incapacity recurred in July and again in October, the employee would
> be entitled to FMLA leave without having to re-qualify under the 1,250-hour
> eligibility test so long as the absences occurred within the same 12-month period and
> the employee had not exhausted the 12-week leave entitlement for this or any other
> FMLA-qualifying reason. If the employee needed leave for MS again in a new 12-
> month period, the employee would have to re-qualify under the 1,250-hour eligibility
> test to be entitled to take FMLA leave for the same chronic condition in the new 12-
> month period.

---

[14]Plaintiff argues that this Opinion Letter is not binding on the court.  This is true; however, that
executive agency is nonetheless "a body of experience and informed judgment to which courts and
litigants may properly resort for guidance."  *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.,*
293 F.3d 42, 47 & n. 1 (2d Cir.2002) (quoting *Bragdon v. Abbott,* 524 U.S. 624, 642 (1998) and citing
cases) (noting that despite lack of formal notice-and-comment procedures attending DOL Opinion
Letters, such opinions should be accorded deference); *Samson v. Apollo Resources, Inc.* , 242 F.3d 629,
638 (5th Cir. 2001)("Interpretive and opinion letters by the Department of Labor do not *per se* bind the
court. Such materials, however, do 'constitute a body of experienced and informed judgment' and the
court will give these materials 'substantial weight.').  The court finds the opinion letter persuasive
evidence and a reasonable interpretation of the statute relating to the legal issue presented in this case.

*Id.* at p. 4.[15]

This illustration is on target with Sills's situation in the present matter. She suffers from migraine headaches that result in her need for intermittent leave when the migraines arise. Once Bendix determined she was eligible for that leave, as it did each time she returned the medical certification forms in 2000, 2001, 2002, and 2003), she was entitled to twelve weeks of leave for that condition within each 12 month period. In 2004, however, it is undisputed that at the time she submitted her annual certification form, she had not worked 1,250 hours in the preceding 12 month period. As a result, Bendix appropriately considered the request to be the commencement of a new period of leave and properly denied her request for FMLA leave.

This court's analyis is on par with Congress's stated purposes of the FMLA, which are "(1) to balance the demands of the workplace with the needs of families ...; (2) to entitle employees to take reasonable leave for medical reasons ...; [and] (3) to accomplish the[se] purposes ... in a manner that accommodates the legitimate interests of employers...." 29 U.S.C. § 2601(b)(1)-(3). Congress chose to strike this balance by defining eligible employees as those who have worked for the employer during the previous twelve months and have contributed 1,250 hours of actual work in the 12 month period immediately preceding the commencement of leave. *See* S.Rep. No. 103-3, at 23 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2, 25 (explaining that "the bill does not cover part time or seasonal employees working less than 1,250 hours a year"). There is simply nothing in the statute,

---

[15]During the drafting of this opinion, the Defendant filed a notice alerting the court that the Department of Labor recently discussed the above Opinion Letter FMLA-112 in a second Opinion Letter, FMLA-2005-2-A and verified the opinions in FMLA-112. Because it does not change the outcome herein, the court notes only that the second Opinion Letter exists and confirms the analysis in Opinion Letter FMLA 112, but does not rely on it in the discussion portion of this Opinion and Order.

the regulations, or the legislative history that gives rise to the conclusion that Congress intended to cover workers who did not meet the 1,250 hour requirement at the time leave was sought or that it intended to treat intermittent leaves differently than continuous leave requests.  Plaintiff's broad reading of the eligibility requirements seeks to impermissibly expand the scope and coverage of the FMLA in the face of an express statutory restriction on eligibility. The statutory text is perfectly clear and covers the issue. The right of family leave is conferred only on employees who have worked at least 1,250 hours during the 12 months period immediately preceding the leave.  To hold otherwise would, as the defendant in *Barron* feared, open the flood gates to individuals taking leave who, after exhausting that leave, did not continue to meet the 1,250 hour requirement.  Given the balance that Congress sought to strike between the interests of employees and those of an employer, the court cannot conclude that this is the result Congress intended.  Accordingly, the court concludes that Bendix properly recalculated Sills's eligibility in January 2004 and, in addition, properly concluded that she was not eligible for FMLA leave at that time.

Plaintiff also, however,  claims interference with her FMLA rights by asserting that Bendix should have notified her earlier that her absences between January 19, 2004 and February 18, 2004 were not counted as FMLA absences.  She argues that because 29 C.F.R. 825.208 places certain requirements on employers to notify an employee that the leave is designated and will be counted as FMLA leave, it interfered with Sills's rights by not promptly notifying her that she was ineligible for FMLA leave.  The penalty for such a violation, Sills argues, is that she is entitled to have the leave count as FMLA leave despite her ineligibility for such leave.  *See* 29 C.F.R. 825.700(a) ("If an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement.").

19

The United States Supreme Court has recently decided the precise issue before the court in *Ragsdale v. Wolverine World Wide, Inc*., *U.S.,* 535 U.S. 81 (2002). In that case, the Court held that 825.700(a) (the counterpart and the enforcement mechanism to 29 C.F.R. 825.208) was beyond the DOL's authority and contrary to the FMLA and, thus, that Tracy Ragsdale was not entitled to an additional twelve weeks' leave, even though her employer had not specifically notified her whether the thirty weeks she had taken were FMLA-qualifying. *Id.* at 1159.  In analyzing the plaintiff's claim that she was entitled to additional leave, the court explained:

> The penalty provision does not say that in certain situations an employer's failure to make the designation will violate § 2615 and entitle the employee to additional leave. Rather, the regulation establishes an irrebuttable presumption that the employee's exercise of FMLA rights was impaired--and that the employee deserves 12 more weeks. There is no empirical or logical basis for this presumption, as the facts of this case well demonstrate. Ragsdale has not shown that she would have taken less leave or intermittent leave if she had received the required notice. As the Court of Appeals noted--and Ragsdale did not dispute in her petition for certiorari-- "Ragsdale's medical condition rendered her unable to work for substantially longer than the FMLA twelve-week period." 218 F.3d, at 940. In fact her physician did not clear her to work until December, long after her 30-week leave period had ended. Even if Wolverine had complied with the notice regulations, Ragsdale still would have taken the entire 30-week absence. Blind to this reality, the Secretary's provision required the company to grant Ragsdale 12 more weeks of leave--and rendered it liable under § 2617 when it denied her request and terminated her.
>
> The challenged regulation is invalid because it alters the FMLA's cause of action in a fundamental way: It relieves employees of the burden of proving any real impairment of their rights and resulting prejudice. In the case at hand, the regulation permitted Ragsdale to bring suit under § 2617, despite her inability to show that Wolverine's actions restrained her exercise of FMLA rights. Section 825.700(a) transformed the company's failure to give notice--along with its refusal to grant her more than 30 weeks of leave--into an actionable violation of § 2615. This regulatory sleight of hand also entitled Ragsdale to reinstatement and backpay, even though reinstatement could not be said to be "appropriate" in these circumstances and Ragsdale lost no compensation "by reason of" Wolverine's failure to designate her absence as FMLA leave. By mandating these results absent a showing of consequential harm, the regulation worked an end run around important limitations of the statute's remedial scheme.

*Ragsdale*, 535 U.S. at 90-91.  This strong language in *Ragsdale* suggests  that an employer's

failure to provide the notice in the regulations does not automatically give rise to an interference

claim or to an entitlement to leave where an employee is not otherwise eligible.  Rather, what

*Ragsdale* requires is evidence of an impairment of the employee's rights because of the employer's

failure to give timely notice under the regulations.

Sills attempts to show an impairment of her rights by alleging that had she known that her

absences would not count as FMLA leave she would have over-medicated herself so she could

return to work and avoid further absences.  This argument is flatly contradicted by the evidence,

for Plaintiff's own deposition testimony establishes that she was unable to work on the days she

missed between January 19,2004 and February 18, 2004.  For Sills to now say that she was

capable of working means that the employer could not have designated the leave as FMLA-

qualifying in the first instance since to be eligible for FMLA leave, Sills had to suffer from a

serious health condition that made her unable to fulfill the responsibilites of her job.  Accordingly,

the court finds this argument disingenuous. *See Holmes v. e.spire Communications* 135 F.Supp.2d

657, 665 (D.Md.,2001) (rejecting and finding contrary to the evidence,  the plaintiff's contention

that "it is quite likely and reasonable to conclude that with the additional two weeks, and faced

with the choice of losing her job or providing for her children, that [Plaintiff] would had to have

returned.").

Moreover, Sills did, in fact, receive notice on February 18, 2004 that she was ineligible for

FMLA leave.  This was 8 days after her certification paperwork had been returned by her

physician indicating the medical need for FMLA leave for the period of January 20, 2004 until

January 20, 2005.  Under the regulations cited by Plaintiff, this was untimely.  However, it cannot

be argued that Sills was prejudiced by what turns out to be a six day delay.  She remained

ineligible for FMLA leave whether she received notice on February 12 or February 18.  Thus,

under either scenario, the employer was entitled to count the absences from January 20 until

February 10 against her under the Attendance Policy.  Accordingly, because Sills has not raised

a genuine issue of fact as to whether the absence of notice under the regulations impaired her

FMLA rights, the court concludes that Bendix did not interfere with her rights by failing to

provide her with timely notice that her absences from January 19 through February 10 were not

FMLA approved absences.

In sum, the Defendant's Motion for Summary Judgment as to Plaintiff's FMLA

interference claim is GRANTED.[16]  The Plaintiff's cross-motion for partial summary judgment

is DENIED.

**Discrimination/Retaliation**

As to Sills's claim for FMLA discrimination/retaliation, the court must evaluate a claim

of FMLA retaliation the same way that we would evaluate a claim of retaliation under other

employment statutes, such as the ADA or Title VII. *See King v. Preferred Technical Group,* 166

F.3d 887, 891 (7th Cir.1999). Therefore, to prove retaliation, Sills may rely on a direct or indirect

method of proof.  *Buie v. Quad/Graphics, Inc.* 366 F.3d 496, 503 -504 (7th Cir. 2004).  There are

two types of permissible evidence under the direct method: direct evidence and circumstantial

evidence. *Id.*  The former "essentially requires an admission by the decision-maker that his actions

were based upon the prohibited animus." *Id.*  The latter is evidence that "allows a jury to infer

---

[16]In light of this conclusion, the court need not address Bendix's second argument that it properly
denied Sills leave because she did not return the certification paperwork in a timely manner.

intentional discrimination by the decision-maker." *Id.* In the absence of direct evidence, circumstantial evidence must compose "a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir.1994); *Allen v. Fort Wayne Foundry Corp.* 2005 WL 2347266, *7(N.D.Ind. September 26, 2005).   This circumstantial evidence is of three general types: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the employee did not deserve termination and that the employer's reason for termination is a pretext for discrimination. *Volovsek v. Wis. Dep't of Agric., Trade and Consumer Prot.,* 344 F.3d 680, 689-90 (7th Cir.2003).

In her brief, Sills contends that "the mosaic of evidence shows that Bendix treated Sills less favorably than similarly situated employees solely because Sills used intermittent FMLA leave for several consecutive years."  Yet, Sills  points to no evidence of discriminatory or retaliatory animus to support an inference of discrimination. Sills does argues that Bendix discriminated against her by not permitting her to utilize the Medical Leave Policy to excuse her absences from January 20, 2004 onward. As part of this argument, Sills notes that the Medical Leave Policy states only that the "approved leave will count as 20 hours and one occurrence for all shifts for two or more days of absence." Nowhere in this statement, Sills argues, does there exist a requirement that the two or more days be consecutive, as Bendix claims, and thus, the interpretation of the policy to include only consecutive leaves of absence is discriminatory.

True enough, the word "consecutive" is absent from the policy, but Plaintiff's argument is a red herring since  there is no evidence of disparate treatment on the part of Bendix in applying the policy to persons that had taken FMLA or those that had not.  Both Scott and Miller testified

that Bendix interpreted the Medical Leave Policy to apply only to consecutive leaves, not intermittent leaves like Sills requested.  (Scott Dep. at 35-36; Miller Dep. at 17); Further, Miller submitted an affidavit that is undisputed wherein she avers that "Bendix has not allowed any employee to take a Medical Leave of Absence on an intermittent basis."  (Miller Aff. at ¶21). Thus, the mere fact that Sills was told she did not qualify under the Medical Leave Policy does not suggest any nefarious motive by Bendix.

Sills also contends that her termination was hastened by her prior complaints of FMLA retaliation by her supervisors.  Viewing the record in the light most favorable to her, it is logical to assume that Bendix may very well have wanted to get rid of Sills because she attended work so sporadically and infrequently due to her migraines, so they leaped at the chance to terminate her when it presented itself.  But, so long as Bendix honored her rights under the FMLA, there is no discrimination claim here.  Indeed, the record reflects that Bendix went beyond what was required of an employer in dealing with Sills's medical condition.  Thus, when they terminated her "they did so *in spite of* h[er] rights under the FMLA, not *because* [s]he asserted those rights. In other words, they did not seek to punish h[er] for exercising rights or opposing an unlawful procedure; they did not even treat h[er] differently than someone not entitled to FMLA leave." *Kauffman v. Federal Exp. Corp*., ____ F.3d ___ ,2005 WL 2649978, *4 (7th Cir. October 18, 2005).

Indeed, the undisputed evidence is that every employee, those who had taken FMLA leaves and those who had not during their tenure at Bendix, who reached Step 4 of the Attendance Policy was terminated.  There is no contrary evidence which suggests that Sills was treated any differently.  For these reasons, Sills has not presented sufficient evidence under the direct method

24

of proof to warrant a trial on her claim of FMLA discrimination.

Sills fares no better under the indirect method of proof. "The order of proof concerning retaliation under the indirect method, however, differs slightly. To establish a prima facie case, a plaintiff must show that after [engaging in protected conduct] only she, and not any similarly situated employee who did not [engage in protected conduct], was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial." Id.

Under the facts of this case, even if the court gives Sills the benefit of the doubt that she had engaged in protected activity (either by requesting FMLA leave in January 2004 or by her complaints of FMLA retaliation in January 2003), she has produced no evidence to demonstrate that the reason provided by Bendix for her termination was not the real reason. As noted above, there is no evidence of disparate treatment – all employees reaching Step 4 of the Attendance Policy were terminated. Further, there is no other evidence that would call into question the validity of Bendix's decision to terminate Sills. To the extent that Sills relies on her prior complaints of retaliation as pretext evidence, her complaints were more than a year prior to the events leading to her termination and the record is void of evidence that Bendix considered these complaints when it denied her FMLA leave in January 2004 or when it determined that she had reached Step 4 of the Attendance Policy. Accordingly, Sills has not presented a triable issue of fact under this indirect method. Summary judgment is therefore GRANTED in Bendix's favor on

Sills's claim of discrimination.[17]

## CONCLUSION

Based on the foregoing, the Defendant's Motion for Summary Judgment is GRANTED. Plaintiff's Motion for Partial Summary Judgment is DENIED.  Plaintiff's Motion to Strike is DENIED as is the Defendant's Motion to Strike.  The Clerk is directed to enter judgment in favor of the Defendant.

Entered: This 20th day of October, 2005.

s/ William C. Lee

United States District Court

Northern District of Indiana

---

[17]Bendix's Motion to Strike the Affidavit of Donald Andrew Sills will be DENIED as MOOT. The court did not rely on the statements contained in Sills's affidavit in reaching the conclusion and, even if the court had considered the statements, the result would remain unchanged.